1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   NATIONAL ASSOCIATION OF                 CASE NO. CV F 07-0820 LJO DLB
     HOME BUILDERS,
12                                           **DECISION ON CROSS-SUMMARY**
                              Plaintiff,     **JUDGMENT MOTIONS**
13   _____ (Docs. 24, 36.)

14          vs.

15   THE SAN JOAQUIN VALLEY UNIFIED AIR
     POLLUTION CONTROL DISTRICT, et al.,
16
                              Defendants.
17   _____/

18                           **BACKGROUND**

19          Plaintiff National Association of Home Builders ("NAHB") seeks by summary judgment to

20   invalidate and to enjoin enforcement of a land development air emissions rule of defendant San Joaquin

21   Valley Air Pollution Control District ("District").  NAHB contends that the rule is preempted by the

22   federal Clean Air Act.  The District and defendant-intervenors Environmental Defense and Sierra Club

23   seek summary judgment that the District's rule is valid and enforceable and not preempted.  This Court

24   considered the parties' cross-summary judgment motions on the record [1] and VACATES the October

25   _____

26          [1]     This Court carefully reviewed and considered all arguments, points and authorities, declarations,
     depositions, exhibits, statements of undisputed facts and responses thereto, and other papers filed by the parties.  Omission
27   of reference to an argument, document, or paper is not to be construed to the effect that this Court did not consider the
     argument, document, or paper.  This Court thoroughly reviewed and considered the arguments, points of law and evidence
28   that it deemed admissible, material and appropriate for this decision.

                                        1

1  30, 2008 hearing, pursuant to Local Rule 78-230(h).  For the reasons discussed below, this Court

2  DECLARES the rule valid and enforceable and GRANTS the District, Environmental Defense and

3  Sierra Club summary judgment.

## INTRODUCTION

### The Parties

6  NAHB is a national building trade association with more than 235,000 members, including land

7  developers and individuals and firms which construct and remodel residential, commercial and industrial

8  projects.  NAHB's mission is to enhance the climate for the housing and building industry and to achieve

9  balanced national legislative, regulatory and judicial public policy as to builders.

10  The District is a unified air pollution control district created under the California Health and

11  Safety Code to develop and implement strategies to reduce emissions in eight San Joaquin Valley

12  counties[2] covering approximately 25,000 square miles.  The District's 15-member Governing Board

13  ("Board") is a defendant[3] and is authorized to adopt District rules and regulations, including District

14  Rule 9510 Indirect Source Review ("Rule 9510").  In this action, NAHB challenges Rule 9510, which

15  NAHB claims requires its members to reduce emissions from construction equipment and other air

16  pollution sources related to construction and development.  Rule 9510 regulates nearly 175 NAHB

17  members in the San Joaquin Valley.

18  Environmental Defense is a national non-profit organization with 1,800 San Joaquin Valley

19  members.  Environmental Defense represents health and environmental concerns of its members.  Sierra

20  Club is a national environmental organization with 5,000 San Joaquin Valley members.  Sierra Club has

21  litigated against developers to address indirect source emissions.

### Federal Regulation Of Air Quality – The Clean Air Act

23  In California, air quality is regulated under the federal Clean Air Act ("CAA"), 42 U.S.C. §§

24  / / /

25

26  [2]    The counties comprise Fresno, Kings, Madera, Merced, San Joaquin, Stanislaus and Tulare and portions
of Kern County.

27

28  [3]    The District, Board, Environmental Defense and Sierra Club will be referred to collectively as the "District
defendants."

2

7401, et seq.,[4] and the California Clean Air Act, Cal. Health & Safety Code, §§ 39000, et seq.  Under the CAA, regulatory authority is bifurcated between the federal Environmental Protection Agency ("EPA") and states.  EPA identifies pollutants to regulate and establishes national ambient air quality standards ("NAAQS").  EPA sets NAAQS for "criteria" pollutants, including coarse particulate matter ("PM10"), fine particulate matter ("PM2.5"), ozone, carbon monoxide, nitrogen dioxide, sulfur dioxide and lead, and designates regions as in "attainment" or "nonattainment" of the standards.  42 U.S.C. §§ 7407, 7409.

In areas designated as nonattainment for a pollutant, states are empowered to develop and submit for EPA approval state implementation plans ("SIPs") to provide attainment, maintenance and enforcement of NAAQS within the state.  SIPs include rules and measures to demonstrate that NAAQS will be attained by dates set in the CAA.  *See* 42 U.S.C. §§ 7409, 7410(a).  EPA reviews and approves SIPs, and after its approval, an SIP is enforceable by EPA and the state.

### *Mobile Emissions Sources*

The federal government regulates road and nonroad mobile sources of air pollution with limited exceptions:

1. Section 7543(a) prohibits a state to "adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines."  Section 7543(b) authorizes EPA to grant a "waiver" of the section 7543(a) prohibition "after notice and opportunity for public hearing" and "if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards";

2. Section 7543(e)(1)(A) prohibits a state to "adopt or attempt to enforce any standard or other requirement relating to the control of emissions" from "[n]ew engines which are used in construction equipment or vehicles . . . and which are smaller than 175 horsepower."  Section 7543(e) does not authorize EPA to grant a waiver of the prohibition; and

---

[4] Unless otherwise noted, all further statutory references will be to the CAA, Title 42 of the United States Code.

3.      For all other nonroad vehicles and engines not covered by section 7543(e)(1)(A) (i.e., new nonroad engines of 175 or more horsepower and used nonroad engines or vehicles of any horsepower), section 7543(e)(2)(A) mandates EPA "after notice and opportunity for public hearing" to authorize California "to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles or engines if California determines that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards."

The District notes that preemption of sections 7543(a) and 7543(e)(1) apply to "showroom new" vehicles and engines and that only section 7543(e)(2) applies to used engines.

### *Indirect Emissions Sources*

The CAA authorizes states to regulate indirect sources of emissions (parking lots and garages) and to include indirect source review programs in their attainment plans in that section 7410(a)(5)(A)(ii) generally prohibits EPA to "include any indirect source review program for any air quality control region, or portion thereof."   Section 7410(a)(5)(C) defines "indirect source" as "a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution."  An "indirect source review program" is "the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution" that would contribute to exceeding, or prevent maintenance of, an NAAQS.  42 U.S.C. § 7410(a)(5)(D).  "Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose" of an indirect source review program.  42 U.S.C. § 7410(a)(5)(C).

NAHB explains that under section 7410(a)(5), indirect sources, unlike stationary and mobile sources, are not regulated based on their own emissions but rather emissions from the mobile sources they attract.  The District notes that section 7410(a)(5) allows states to "regulate the air pollution effects of developments and installations that attract mobile sources of air pollution."

### **California Regulation Of Air Quality – The California Clean Air Act**

In California, regulatory authority under the California Clean Air Act is bifurcated between the California Air Resources Board ("CARB") and 35 local air districts, including the District.  *See* Cal.

4

1   Health & Safety Code, § 39002.  The California Clean Air Act authorizes CARB to set state ambient

2   air quality standards and tailpipe emissions standard for vehicles.  Cal. Health & Safety Code, § 39002.

3   Local air districts have "primary responsibility" to control other sources, including stationary sources

4   (factories and oil refineries) and mobile sources "in use" through indirect and areawide source programs

5   and transportation control measures.  *See* Cal. Health & Safety Code, §§ 39002, 40716, 40717.  The

6   California Clean Air Act directs local air districts to consider the "full spectrum of emissions sources"

7   to develop attainment plans and to "focus particular attention on reducing emissions from transportation

8   and areawide emission sources."  Cal. Health & Safety Code, §§ 40910.

9       To regulate indirect sources, local air districts designated as nonattainment for ozone are required

10  to include indirect and areawide source control programs in their attainment plans.  Cal. Health & Safety

11  Code, § 40918(a)(4).  The local air districts are also authorized to assess fees on such sources to cover

12  costs of mitigation and control programs.  Cal. Health & Safety Code*, §§ 42311(g), 40604.

13      The federal SIP in California is jointly developed by CARB and local air districts.  Each local

14  air district develops its attainment plan for pollutants and forwards the plan to CARB, which adds its

15  mobile source tailpipe regulations and forwards the entire plan to EPA for review and inclusion in the

16  federal SIP.  Cal. Health & Safety Code, §§ 40001, 40911, 41500, 41650.

17                                    **The District's Attainment Plans**

18      The San Joaquin Valley has had historic inability to comply with NAAQS for PM10, particulate

19  matter 10 microns and smaller.  The EPA has classified the San Joaquin Valley as "serious"

20  nonattainment for the federal PM10 standard.  The San Joaquin Valley was unable to meet the December

21  31, 2001 deadline to attain the federal PM10 standard.  To extend the deadline, the District was required

22  to develop a new attainment plan with more stringent requirements.  The new plan needed to

23  demonstrate that the best available control measures ("BACM") would be implemented on stationary

24  sources in the San Joaquin Valley and that PM10 and PM10 precursors would be reduced by five percent

25  per year until attainment was reached.  *See* 42 U.S.C. §§ 7513a(b)(1)(B), 7513a(d), 7513a(e).  EPA was

26  authorized to require the plan to include "all measures that can be feasibly implemented in the area . .

27  ."  42 U.S.C. § 7509(d)(2).

28      To develop a plan to met the BACM and five percent reduction requirements, the District

5

1   determined that indirect and areawide sources, such as residential and commercial developments, were

2   a large source of PM10 and PM10 precursor emissions.  The District included a commitment in its new

3   PM10 plan to adopt an indirect source review program.

4   In June 2003, the Board adopted the new plan ("2003 PM10 Plan").  The 2003 PM10 Plan was

5   approved by CARB and later on May 26, 2004 by EPA, which added measures contained therein to the

6   California SIP.  The District claims that by such action, the District's commitment to adopt an indirect

7   source regulation became federal law.

8   On October 30, 2006, EPA found that the San Joaquin Valley had attained the federal standard

9   for PM10.  As such, the District was required to submit a new "maintenance plan" for EPA approval.

10  The District notes that 2003 PM10 Plan's "stringent control measures" needed to be included in the

11  maintenance plan in that the CAA prohibits relaxing control measures or "backsliding."  *See* 42 U.S.C.

12  § 7505a(c).  When the District adopted its maintenance plan on September 20, 2007, it contained all

13  current regulations, including Rule 9510.

14  **The District's Ozone Plan**

15  The District notes that similar to PM10, the San Joaquin Valley has some of the worst ozone

16  pollution in the United States.  In May 2004, the EPA reclassified the San Joaquin Valley to "extreme"

17  nonattainment, the worst nonattainment classification.

18  The "extreme" classification required the District to submit a new, more stringent attainment plan

19  to EPA.  The District needed to explore implementation of all feasible regulations on sources of ozone

20  precursor emissions to develop an approvable plan.  In particular, the District decided to explore the

21  feasibility of new regulations on previously unregulated sources of air pollution.

22  The District determined that increase in indirect source emissions, including new residential and

23  commercial development, nullified emissions reductions achieved from other regulations.   In its

24  "Extreme One-Hour Ozone Plan," the District included an indirect source regulation to control emissions

25  from indirect sources.  The District adopted this plan on October 8, 2004.  The District fulfilled its PM10

26  Plan and Extreme One-Hour Ozone Plan commitments by adopting the indirect source regulation at

27  / / /

28  / / /

6

1    issue here, District Rules 9510 (indirect source review) and 3180 (fees).[5]

2                                          **Rule 9510**

3         On December 15, 2005, the Board by unanimous vote adopted Rule 9510, which became

4    effective March 1, 2006.  NAHB characterizes Rule 9510 to impose significant new restrictions on

5    emissions from construction and operation of residential, commercial and industrial projects.  The

6    District counters that Rule 9510 "is designed to achieve reductions in air pollution attributable to

7    development projects."  Environmental Defense and Sierra Club note that Rule 9510 "is designed to

8    encourage developers to find ways to minimize the increase in air pollution from mobile sources that

9    is indirectly caused by new development and sprawl."

10        When Rule 9510 was adopted, the San Joaquin Valley was classified as nonattainment under

11   federal and state standards for PM10, PM2.5 and ozone.  PM10 and PM2.5 can be directly-emitted

12   geologic material, including entrained road and other dust.  PM10 and PM2.5 can be formed when

13   precursor emissions, such as oxides of Nitrogen ("NOx") and volatile organic compounds ("VOCs") are

14   emitted as a gas and form PM10 and PM2.5 through chemical processes.  The District notes that new

15   residential and commercial development indirectly causes air pollution by attracting mobile sources and

16   contributing increased energy use.

17        In short, Rule 9510 targets indirect sources of air pollution.  Rule 9510 sets target reductions for

18   emissions associated with construction ("construction emissions") and future operation of development

19   projects ("operational emissions").  For construction, Rule 9510's target is to reduce PM10 emissions

20   by 45 percent and NOx by 20 percent as compared to emissions generated using "average" construction

21   equipment in California.  For future operation, Rule 9510's target is to incorporate mitigation measures

22   into project design to reduce emissions that would be otherwise indirectly caused by the project (e.g.,

23   increased traffic) over a 10-year period.  The PM10 target is to reduce unmitigated operational emissions

24   by 50 percent.  The NOx target is to reduce emissions by 33.3 percent.

25        The District explains that under Rule 9510, a computer model is used to calculate emissions

26   attributable to "construction" and "operational" phases of a development project, and the project

27

28        [5]        NAHB primarily challenges Rule 9510.

1  developer is responsible to mitigate a portion of those emissions.  The District notes that under Rule
2  9510, mitigation may be achieved: (1) "on-site" by incorporating design features and other pollution
3  mitigation measures into the project; (2) "off-site" by paying a mitigation fee which the District uses to
4  "buy" requisite amount of emissions reductions through its emissions reduction incentive program
5  ("ERIP"); or (3) by a combination of "on-site" and "off-site" measures.

6       Rule 9510 defines "construction emissions" as "any NOx or exhaust PM10 emissions resulting
7  from the use of **internal combustion engines related to construction activity**, which is under the
8  control of the applicant through either ownership, rental, lease agreements, or contract."  (Bold added.)
9  Rule 9510 defines "operational emissions" as "the combination of area and mobile emissions associated
10 with an indirect source."  Rule 9510 defines "mobile emissions" as "the NOx and PM10 emissions
11 generated by motorized vehicles."  Rule 9510 defines "indirect source" as "any facility, building,
12 structure, or installation, or combination thereof, which attracts or generates mobile source activity that
13 results in emissions of any pollutant, or precursor thereof, for which there is a state ambient standard .
14 . ."

15      To be covered by Rule 9510, emissions from a development project must exceed two tons per
16 year of operational NOx and PM10 at full build-out.  The District equates the threshold to 50 residential
17 units, 2,000 square feet of commercial space, 25,000 square feet of industrial space, 20,000 square feet
18 of medical office space, 39,000 square feet of general office space, 10,000 square feet of government
19 space, 20,000 square feet of recreational space, or 9,000 square feet of educational or uncategorized
20 space.

21      Rule 9510 addresses general mitigation requirements for construction equipment emissions and
22 provides:

23      The exhaust emissions for **construction equipment greater than fifty (50) horsepower**
24      used or associated with the development project shall be reduced by the following
        amounts from the statewide average as estimated by the ARB [California Air Resources
25      Control Board]:

26           20% of the total NOx emissions, and

27           45% of the total PM10 exhaust emissions.

28      An applicant may reduce construction emissions on-site by using less polluting
        equipment, which can be achieved by utilizing add-on controls, cleaner fuels, or newer

8

1   lower emitting equipment.  (Bold added; Rule 9510 section numbers omitted.)

2   In short, Rule 9510 mandates mitigation of exhaust emissions from construction equipment greater than

3   50 horsepower to a level 20 percent below the statewide fleet average for NOx and 45 percent below the

4   statewide fleet average for PM10.  CARB determines the "statewide average."  The target is calculated

5   by examining the list of larger (more than 50 horsepower) construction equipment to be used and the

6   hours of use typically required for the project.  This level of activity is multiplied by the statewide

7   average emission rate for the types of construction equipment to be used.  The developer determines a

8   project design and plan to achieve the target level of construction emissions, including payment of a fee

9   rather than incorporating changes into a project.

10      As to the operational phase, the District determined that most NOx emissions associated with

11  a development project are due to motor vehicles.  Rule 9510 mandates reductions of operational

12  emissions from area and mobile sources:

13      Applicants shall reduce 33.3% of the project's operational baseline NOx emissions over
14      a period of ten years as quantified in the approved AIA [Air Impact Assessment] as
        specified in Section 5.6.

15          . . .

16
17      Applicants shall reduce 50% of the project's operational baseline PM10 emissions over
        a period of ten years as quantified in the approved AIA as specified in Section 5.6.  (Rule
        9510 section numbers omitted.)
18

19      In short, Rule 9510 requires operational emissions reductions of 33.3 percent for NOx and 50

20  percent for PM10 from a project's operational baseline of 10 years as determined by the project's Air

21  Impact Assessment ("AIA"), which will be addressed in greater detail below.  Rule 9510 defines

22  "baseline emissions" as unmitigated NOx and PM10 emissions calculated by a model used by the

23  District.  The operational emissions target is determined in part on mobile source emissions expected

24  over 10 years from the project based on the project's type and size, parking provided, and/or estimated

25  loading activity.  A project's basic elements are inputted into a computer model to estimate unmitigated

26  "baseline emissions" expected from the project's type. Rule 9510 requires developers to design and plan

27  a project to attract 33.3 percent fewer NOx emissions and 50 percent fewer PM10 emissions.

28  Alternatively, a developer may pay a fee to the District to obtain off-site emission reductions to offset

9

1    project emissions.

2         According to NAHB, its members use or subcontract to use construction equipment such as

3    trucks, backhoes, earth-moving equipment, cranes, generators, and landscaping equipment powered by

4    internal combustion engines greater than 50 and 175 horsepower and which are subject to Rule 9510.

5    NAHB notes that California (and in turn the District) has neither sought nor obtained:

6         1.    Authorization to regulate emissions from new nonroad engines of more than 175

7               horsepower or used nonroad engines or vehicles subject to Rule 9510 pursuant to section

8               7543(e)(2)(A); or

9         2.    Waiver to regulate emissions from new motor vehicle engines or motor vehicles pursuant

10              to section 7543(b).

11   According to the District, Rule 9510 has been submitted to EPA for approval as part of an SIP.

12                          **Rule 9510 Application Process**

13        If a development is subject to Rule 9510, the developer must submit an AIA application no later

14   than the date on which the developer applies for final discretionary approval from the relevant local

15   agency.  The AIA is to determine the amount of emissions attributable to a new development project and

16   the amount of mitigation fee, if any.  An AIA quantifies construction and operational NOx and PM10

17   emissions associated with the development project.  Rule 9510 requires an AIA application to identify

18   on-site measures which a developer will implement to mitigate NOx and PM10 emissions associated

19   with a project and specify how the measures will be enforced.

20        Under the AIA process, a developer identifies the voluntary on-site design or mitigation features

21   which it chooses to incorporate into the project, if any.  Rule 9510 requires the District to provide an

22   "On-site Emission Reduction Checklist" that includes on-site measures that an applicant may choose

23   to achieve required reduction in operational emissions.  For the "construction phase," voluntary measures

24   include using newer construction equipment, or exhaust after-treatments, retrofitting existing fleet

25   vehicles with controls to reduce particulates and other air emissions, and replacing fleet vehicles with

26   low-emission vehicles.  For the "operational phase," on-site mitigation measures include energy efficient

27   appliances, electrical landscape maintenance equipment, prohibition to use gas-powered landscape

28   equipment, elimination of wood burning devices, and location near transit services.

1   The District notes that "incorporation of on-site measures can significantly reduce the amount

2   of potential off-site fees."

3   After voluntary on-site measures are identified, project information, including the type of land,

4   number of units, and project location, is inputted into the Urban Emissions Computer Model

5   ("URBEMIS"), which is developed by CARB and California air pollution agencies to estimate air

6   quality impacts from land use projects. URBEMIS generates results for "unmitigated" and "mitigated"

7   emissions from the project. A developer's mitigation responsibility (20 percent of NOx and 45 percent

8   of PM10 for the construction phase and 33 percent of NOx and 50 percent of PM10 for the operational

9   phase) is based on the "unmitigated" result. If the combination of project-specific information and on-

10  site measures ("mitigated" result) achieves the amount of mitigation required by Rule 9510, nothing

11  further is required. If the Rule 9510 mitigation targets are not achieved, the developer is able to add on-

12  site measures and conduct another URBEMIS with those measures included or achieve remaining

13  mitigation by paying a fee to the District. The District uses mitigation fee payments to buy mitigation

14  off-site through ERIP, which, among other things, uses funds to replace older model high-polluting

15  engines with newer, cleaner engines and to promote other pollution saving measures. For every ton of

16  NOx or PM10 not mitigated on-site, the District purchases an equivalent reduction of that same pollutant

17  off-site.

18  The District notes that mitigation fees for residential developments average $54.42 per house for

19  the construction phase and $327 per house for the operational phase.

20  The District may enforce Rule 9510 by issuing violation notices and may seek misdemeanor

21  penalties up to $75,000 for each day on non-compliance and imprisonment up to a year.

22  **NAHB's Claims**

23  NAHB challenges Rule 9510's "burdensome" regulatory scheme and "extensive requirements"

24  on its developer members as exceeding the District's authority. NAHB seeks this Court's declaration

25  that the CAA preempts Rule 9510 to render Rule 9510 invalid in that the District attempts to enforce

26  a "standard or other requirement relating to the control of emissions" of construction equipment and

27  vehicles, nonroad vehicles and engines, and motor vehicles and engines. NAHB argues that Rule 9510

28  "imposes mandatory emission reduction requirements relating to both nonroad construction equipment

and on-road and nonroad vehicles used in the operation and maintenance of a development." NAHB faults Rule 9510's adoption without notice and opportunity for a public hearing. NAHB further seeks a permanent injunction of Rule 9510's enforcement.

The District defendants respond that Rule 9510 is a proper use of the District's police powers and not preempted by the CAA. The District defendants equate Rule 9510 as a local indirect source review program which Congress recognized as necessary to control development to address mobile source emissions associated with such projects. Environmental Defense and Sierra Club succinctly note that the "issue to be resolved in this case is whether the District's Rule 9510 is preempted under the federal Clean Air Act."

## DISCUSSION

### Summary Judgment Standards

F.R.Civ.P. 56(a) permits a party "claiming relief" to seek "summary judgment on all or part of the claim." F.R.Civ.P. 56(b) permits a party "against whom relief is sought" to seek "summary judgment on all or part of the claim." Summary judgment is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

As discussed below, the CAA does not preempt Rule 9510, and the District defendants are entitled to summary judgment on NAHB's claims as a matter of law.

### Federal Preemption

Under the U.S. Constitution's Supremacy Clause, the U.S. Constitution and federal laws "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. "Congress has the authority, when acting pursuant to its enumerated powers, to preempt state and local law." *Oxygenated Fuels Association, Inc. v. Davis*, 331 F.3d 665, 667 (9th Cir. 2003). Preemption is characterized as: (1) express ("Congress can define

12

explicitly the extent to which its enactments pre-empt state law"); (2) field ("state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively"); or (3) conflict ("state law is pre-empted to the extent that it actually conflicts with federal law"). *English v. General Elec. Co.*, 496 U.S. 72, 78-79, 110 S.Ct. 2270 (1990); *Oxygenated Fuels*, 331 F.3d at 667.

Courts "must begin with the presumption that Congress did not intend to preempt state law." *Malabed v. North Slope Borough*, 335 F.3d 864, 869 (9th Cir. 2003). "Congressional intent to preempt state law must be clear and manifest." *Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1150 (9th Cir. 2000), *cert. denied*, 531 U.S. 929, 121 S.Ct. 309 (2000). If a court has "any doubt about congressional intent," the court is "to err on the side of caution, finding no preemption." *Malabed*, 335 F.3d at 869.

The Congressional purpose is the "ultimate touchstone" of preemption analysis. *Cippollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608 (1992). "As a result, any understanding of the scope of a pre-emption statute must rest primarily on 'a fair understanding of congressional purpose.'" *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485-486, 116 S.Ct. 2240 (1996) (quoting *Cipollone,* 505 U.S. 504 at 530, n. 27, 112 S.Ct. 2608). "Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue. . . . If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Trans., Inc. v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 113 S.Ct. 1732 (1993). "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Nonetheless, "[p]reemption provisions are narrowly and strictly construed." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 474 (9th Cir. 2007).

Even where a federal statute preempts an entire field of regulation, "every state statute that has some indirect effect [on that field] . . . is not pre-empted." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 308, 108 S.Ct. 1145, 1155 (1988). "Tension between federal and state law is not enough to establish conflict preemption." *Incalza v. Fendi North America, Inc.*, 479 F.3d 1005, 1010 (9th Cir.

13

2007).  A court finds preemption only in "those situations where conflicts will necessarily arise." *Goldstein v. California*, 412 U.S. 546, 554, 93 S.Ct. 2303 (1973).  A "hypothetical conflict is not a sufficient basis for preemption."  *Total TV v. Palmer Communications, Inc.*, 69 F.3d 298, 304 (9th Cir. 1995).

Moreover, "there is a general presumption against preemption in areas traditionally regulated by states." *Oxygenated Fuels*, 331 F.3d at 668 (9th Cir. 2003).  As to such areas, preemption applies only "where there is 'clear evidence' that Congress meant to assert federal control." *Oxygenated Fuels*, 331 F.3d at 673.  "Environmental regulation is an area of traditional state control." *Oxygenated Fuels*, 331 F.3d at 673.  "Air pollution falls under the broad police powers of the states, which include the power to protect the health of citizens in the state." *Exxon Mobil Corp. v. U.S. Environmental Protection Agency*, 217 F.3d 1246, 1255 (9th Cir. 2000).  The CAA "generally seeks to preserve state authority" in that it declares that air pollution prevention and air pollution control are "the primary responsibility of States and local governments." *Oxygenated Fuels*, 331 F.3d at 670-671 (quoting 42 U.S.C. § 7401(a)(3)).

As discussed in greater detail below, Rule 9510 is an air pollution control measure subject to state responsibility, not CAA preemption.  Given Congressional intent for state and local governments to address air pollution, section 7543 is not to be construed overbroadly to preclude Rule 9510's efforts to control air pollution.

## CAA Preemption

"The overriding purpose of the [federal] Clean Air Act is to force the states to do their job in regulating air pollution effectively . . ." *Exxon*, 217 F.3d at 1255.  Congress specifically found that "that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments."  42 U.S.C. § 7401(a)(3).

Under section 7543(b), California was granted an exemption from section 7543(a) preemption. *Engine Manufacturers Association v. U.S. Environmental Protection Agency*, 88 F.3d 1075, 1079 (D.C. Cir. 1996).  "Thus, motor vehicles must be either 'federal cars' designed to meet EPA's standards or 'California cars' designed to meet California standards." *Engine Manufacturers*, 88 F.3d at 1080.

14

1    NAHB argues that section 7543 contains "three discrete express preemption clauses" to

2  invalidate Rule 9510.   NAHB contends that the "relevant field" is "regulation of mobile source

3  emissions, not regulation of air quality in general."   The District responds that there is no preemption

4  in light of the general presumption against preemption and that Rule 9510 addresses an area traditionally

5  regulated by the states.   The District contends that it properly adopted Rule 9510 under its section 7410

6  authority over indirect sources of air pollution.   Environmental Defense and Sierra Club criticize NAHB

7  for attempting to expand unduly section 7543 preemption.

8    **New Nonroad Engines Smaller Than 175 Horsepower**

9    NAHB contends that with section 7543(e)(1), "Congress completely precluded California and

10  other states from regulating new nonroad engines smaller than 175 horsepower." As such, NAHB seeks

11  by summary judgment as to its first cause of action this Court's declaration that section 7543(e)(1)

12  preempts Rule 9510 as a standard relating to emissions from new engines smaller than 175 horsepower.

13    The District responds that section 7543(e)(1) cannot preempt Rule 9510 because Rule 9510 does

14  not impose a standard or other requirement "relating to the control of emissions" and section 7543(e)(1)

15  applies to "showroom new" engines and vehicles over which Rule 9510 imposes no "requirements."

16  The District notes that Rule 9510 "regulates development sits through land use features and not tailpipe

17  emissions."

18    The CAA's 1990 Amendments created a scheme to regulate emissions from nonroad sources,

19  including bulldozers, lawnmowers, and similar equipment.   *Pacific Merchant Shipping Assoc. v.*

20  *Goldstene*, 517 F.3d 1108, 1110 (9th Cir. 2008).   Section 7543(e)(1) addresses new engines in

21  construction equipment or vehicles smaller than 175 horsepower:

22          No State or any political subdivision thereof shall adopt or attempt to enforce any
        standard or other requirement relating to the control of emissions from either of the
23        following new nonroad engines or nonroad vehicles subject to regulation under this
        chapter –

24
          (A) New engines which are used in construction equipment or vehicles . . . and
25        which are smaller than 175 horsepower.

26          (B) New locomotives or new engines used in locomotives.  Subsection (b) of this
        section [allowing states to apply for a waiver of preemption] shall not apply for purposes
27        of this paragraph.

28  With section 7543(e)(1), "Congress expressly preempted state regulation of emissions from new engines

15

1   used in construction and farm equipment, new engines smaller than 175 horsepower, and new

2   locomotive engines." *Pacific Merchant*, 517 F.3d at 1110.

3          NAHB notes that section 7543(e)(1) prohibits a state to adopt or enforce "any standard or other

4   requirement" relating to emissions from new nonroad engines or vehicles "smaller than 175

5   horsepower."   NAHB argues that Section 7543's "standard" as modified by "any" and "relating to" has

6   far-reaching effect:

7          Today, as in 1967 when § 209(a) [section 7543(a)] became law, "standard" is defined as
          that which "is established by authority, custom, or general consent, as a model or
8          example; criterion; test." Webster's Second New International Dictionary 2455 (1945).
          The criteria referred to in § 209(a) relate to the emission characteristics of a vehicle or
9          engine. To meet them the vehicle or engine must not emit more than a certain amount of
          a given pollutant, must be equipped with a certain type of pollution-control device, or
10         must have some other design feature related to the control of emissions. This
          interpretation is consistent with the use of "standard" throughout Title II of the CAA
11         (which governs emissions from moving sources) to denote requirements such as
          numerical emission levels with which vehicles or engines must comply, e.g., 42 U.S.C.
12         § 7521(a)(3)(B)(ii), or emission-control technology with which they must be equipped,
          e.g., § 7521(a)(6).

13

14  *Engine Manufacturers Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252-253, 124 S.Ct.

15  1756 (2004) ("*EMA"*).

16         NAHB argues that the U.S. Supreme Court's interpretation of "standard" in section 7543(a)

17  applies to nearly identical language in section 7543(e)(1). "Although [in *EMA]* it defined 'standard'

18  under § 209(a) [section 7543(a)], the [Supreme] Court indicated that its definition of 'standard' is

19  applicable throughout Title II of the Clean Air Act, which includes § 209(e) [section 7543(e)(1)]. . . .

20  Indeed, § 209(e) contains the phrase 'standard or requirement relating to the control of emissions,' which

21  is essentially identical to § 209(a)'s 'standard relating to the control of emissions." *Pacific Merchant*,

22  517 F.3d at 1114.  NAHB continues that to the extent section 7543(a) differs from section 7543(e)(1),

23  section 7543(e)(1) is broader in that "it preempts any standard <u>or other requirement</u> relating to the

24  specified nonroad motor or vehicle emissions." (Underlining in original.)

25         NAHB takes the position that Rule 9510 "is a preempted 'attempt to adopt or enforce' a

26  'standard' or 'other requirement' 'relating to' emissions."  NAHB argues that section 7543(e)(1)'s

27  language "is expansive because it bars state regulation 'relating to control of emissions' from specified

28  nonroad engines or vehicles less than 175 horsepower."  "Relating to" expresses "a broad preemptive

16

purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S.Ct. 2031 (1992). NAHB contends that Rule 9510 is a "standard or other requirement relating to the control of emissions" in that it requires reductions of emissions from all new or used construction equipment of greater than 50 horsepower from the statewide average by 20 percent of total NOx emissions and 45 percent of total PM10 exhaust emissions. NAHB argues that Rule 9510 does not escape section 7543(e)(1) preemption in that an applicant "can comply with its required emissions reductions by using cleaner burning fuels, add-on controls, idling reduction plans, payment of in-lieu fees or any combination of allowed on- and off-site measures." NAHB concludes that the "choice" between meeting Rule 9510's emission standards through on-site or off-site measures "is no choice at all."

The District criticizes NAHB's interpretation of standard as "so broad that virtually any requirement placed on vehicles, no matter how remote, is a prohibited 'standard.'" The District notes that Rule 9510 mitigation of construction emissions can be achieved without purchasing or altering "new" engines. The District points out that Rule 9510 uses the URBEMIS computer model to produce an emissions level for a "typical" project of the same size as the developer's proposed project. The developer can mitigate 20 percent of the NOx and 45 percent of the PM10 emissions of the "typical project" by paying a mitigation fee, which the District uses to mitigate emissions off-site. Or, the developer can mitigate on-site emissions by providing information on equipment that will be used during the construction phase, and such information is inputted into another computer model to calculate emissions based on the project's actual total fleet. The District notes that if the 20 percent NOx and 45 percent PM10 emissions targets are not met, the developer may "mix and match" cleaner and less polluting equipment to offset more polluting equipment. The District notes the absence of numeric standards on new or used engines in that mitigation is based on total site emissions, not those of individual engines. The District concludes that section 7543(e)(1) does not preempt Rule 9510 in the absence of Rule 9510's imposition of requirements on new equipment.

Environmental Defense and Sierra Club point out that the issue as to section 7543(e)(1) is application of its phrase "**standard** . . . relating to control of emissions." Environmental Defense and Sierra Club are correct to focus on "standard" in that the "other requirement" phrase of section 7543(e)(1) is "limited to ancillary mechanisms such as certificates and inspections" not at issue here.

1  *See Engine Manufacturers*, 88 F.3d at 1093.  Environmental Defense and Sierra Club further note this

2  Court's conclusion that the phrase "related to" in the federal Energy Policy and Conservation Act should

3  be "construed as narrowly as the plain language of the law permits."  *Central Valley Chrysler-Jeep v.*

4  *Goldstene*, 529 F.Supp.2d 1151, 1175 (E.D. Cal. 2007).

5      Rule 9510 is not a standard subject to section 7543(e)(1) in that it neither dictates permissible

6  pollutant levels nor mandates emission control technology.  Rule 9510 sets emissions targets for

7  individual development projects, not individual engines.  The emissions target calculations are based

8  on average emissions generated by construction fleet equipment used in California.  NAHB

9  unpersuasively claims that developers "must ensure that their 'fleets' of nonroad contruction equipment

10  emit no more NOx or PM10 than the 'statewide averages' for NOx 10 and PM10 emissions as computed

11  by CARB."[6]  Rule 9510 emissions targets are based on a development's characteristics, not engines or

12  vehicles used.  Rule 9510 specifies no emissions limits that new nonroad engines or vehicles must

13  satisfy.  Rule 9510 does not require manufacturers to produce engines subject to specific numeric

14  emissions limits.  The options to satisfy Rule 9510 with cleaner engines or fee payments does not

15  convert Rule 9510 into a standard relating to control of emissions.  Although Rule 9510 may entice

16  developers to purchase new engines, it mandates neither acceptable engine nor manufacturer

17  requirements for new nonroad engines or vehicles.  NAHB's assertions regarding creation of "an

18  artificial market demand" for cleaner nonroad construction equipment of less than 175 horsepower are

19  unavailing and fail to establish the Rule 9510 incentives relate to the control of emissions.

20      In short, NAHB fails to satisfy that Rule 9510 is a standard or other requirement.  Rule 9510

21  neither limits a vehicle or engine's emissions, requires equipping of pollution-control devices, nor

22  requires emissions control designs.

23  **Other Nonroad Engines Or Vehicles**

24      As applicable here, section 7543(e)(2)(A) addresses all nonroad vehicles and engines other than

25  new engines in construction equipment or vehicles smaller than 175 horsepower:

26      In the case of **any nonroad vehicles or engines** other than those referred to in

27

28      [6]      NAHB's opposition/reply points regarding CARB's Regulation for In-Use Off-Road Diesel Vehicles are less than pertinent and fail to convince that Rule 9510 is a standard.

18

subparagraph (A) or (B) of paragraph (1), the Administrator shall, after notice and opportunity for public hearing, authorize California to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles or engines if California determines that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. (Bold added.)

NAHB notes that section 7543(e)(2)(A) applies to: (1) new nonroad construction engines and vehicles greater than 175 horsepower; and (2) used nonroad construction engines or vehicles of any horsepower. NAHB claims that Rule 9510 places emissions reductions on new or used construction equipment greater than 50 horsepower. NAHB argues that California is unable to adopt and enforce standards and other requirements for nonroad engines or vehicles other than those referred to in section 7543(e)(1)(A) and (B) unless it applies for and is granted EPA authorization. "For nonroad engines and vehicles not covered by § 209(e)(1) [section 7543(e)(1)], Clean Air Act § 209(e)(2) [section 7543(e)(2)] creates a sphere of implied preemption surrounding those regulations for which California must obtain authorization." *Pacific Merchant*, 517 F.3d at 1113. Since California has not applied for Rule 9510 authorization and EPA has not granted Rule 9510 authorization, NAHB contends it is entitled to summary judgment on its second cause of action as to section 7543(e)(2) preemption for other nonroad engines or vehicles.

The District responds that Rule 9510 does not implicate section 7543(e)(2)(A) in that the only significant difference between section 7543(e)(1) and 7543(e)(2)(A) is that section 7543(e)(2)(A) covers "new" and "used" equipment. The District reasserts its 7543(e)(1) arguments as to section 7543(e)(2)(A) in that Rule 9510 is not a standard in the absence of numerical limits on engines and Rule 9510 "simply requires mitigation of a percentage of a project's emissions." The District continues that Rule 9510 requires no EPA "waiver" or authorization in the absence of engine emission standards on new or used non-road engines.

Similar to the section 7543(e)(1) analysis above, Rule 9510 is not a standard or other requirement subject to section 7543(e)(2) and in turn EPA approval. NAHB points to no applicable Rule 9510 mandates to limit a vehicle or engine's emissions or to require pollution-control devices or emissions control designs for nonroad vehicles or engines subject to section 7543(e)(2). Again, Rule 9510's emissions reduction targets address individual development projects, not individual vehicles or engines. In the absence of a standard or other requirement, failure to apply to EPA for Rule 9510 authorization

1   is immaterial.

2   <u>**New Vehicles And Engines**</u>

3   NAHB further seeks Rule 9510 preemption as to new vehicles and engines under section

4   7543(a), which provides: "No State or any political subdivision thereof shall adopt or attempt to enforce

5   any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines

6   subject to this part." NAHB argues that section 7543(a) preempts Rule 9510 as "standards for emissions

7   from new construction vehicles."   Rule 9510 defines "construction" as "any excavation, grading,

8   demolition, **vehicle travel on paved or unpaved surfaces, or vehicle exhaust** that occurs for the sole

9   purpose of building a development project."   NAHB notes that required NOx and PM10 emissions

10  reductions from construction equipment greater than 50 horsepower includes construction motor vehicles

11  such as trucks.

12  NAHB further argues that section 7543(a) preempts Rule 9510 standards for operational

13  emissions.  According to NAHB, the on-site checklist for reduction of operational emissions from mixed

14  use residential development includes motor vehicle "standards," such as "using low-emission delivery

15  vehicles, contracting with carrier, delivery, security or other services utilizing low-emission, alternative

16  fuel, conver[sion] of fleet to cleaner vehicles or utilizing heavy-duty vehicles that are  certified to

17  optional low-emission standards for NOx."   NAHB notes that the on-site checklist items are akin to

18  standards which the U.S. Supreme Court has found preempted, namely, fleet vehicle purchase

19  requirements to replace existing vehicles with low-emitting vehicles and/or retrofitting existing vehicles

20  with emission-control technology. *See EMA*, 541 U.S. at 253, 124 S.Ct. 1756 ("To meet them the

21  vehicle or engine must not emit more than a certain amount of a given pollutant, must be equipped with

22  a certain type of pollution-control device, or must have some other design feature related to the control

23  of emissions. This interpretation is consistent with the use of 'standard' throughout Title II of the CAA

24  (which governs emissions from moving sources) to denote requirements such as numerical emission

25  levels with which vehicles or engines must comply, e.g., 42 U.S.C. § 7521(a)(3)(B)(ii), or

26  emission-control technology with which they must be equipped, e.g., § 7521(a)(6).")

27  The District argues that Rule 9510 "is not a vehicle emissions standard" in that a requirement

28  to mitigate "emissions from vehicles attracted [to] a development by 33% for NOx and 50% for PM10

20

1   is not a requirement that specific vehicles reduce their tailpipe emissions by 33% and 50%."   The

2   District argues that engine or vehicle emissions standards subject to section 7543(a) preemption

3   "contemplate a numeric limit or design feature for the engine or vehicle itself."   The District contends

4   that Rule 9510's operational mitigation requirements address "land use features" and neither place

5   numeric limits on emission characteristics of engines and nor impose engine design requirements.   The

6   District continues that Rule 9510 is neutral as to emission characteristics of vehicles attracted to

7   development sites and "simply requires mitigation of the air pollution effects attributable to new

8   development."   According to the District, since mitigation can be achieved "without altering engine

9   characteristics or vehicles," Rule 9510 mitigation is not an engine emissions standard in that Rule 9510

10  requires mitigation "through land use features and/or payment of an off-site mitigation fee," not the

11  purchase of new equipment or an "engine-by-engine comparison."

12          The District further notes that Rule 9510 sets an emissions reduction goal for developers' fleets

13  as a whole, that is, emissions for the overall fleet of equipment at a development site are to be reduced

14  by a certain percentage of hypothetical project produced by a computer model. The District characterizes

15  Rule 9510 as "engine-neutral" in that "developers can use as dirty or as clean an engine as they want.

16  They just have to offset the emissions."

17          A key of section 7543(a) is avoidance of "the economic disruption latent in having to meet

18  fifty-one separate sets of emissions control requirements."   *See Motor & Equip. Manufacturers. Ass'n

19  v. U.S. Environmental Protection Agency*, 627 F.2d 1095, 1109 (D.C. Cir. 1979), *cert. denied*, 446 U.S.

20  952, 100 S.Ct. 2917 (1980).  As noted above, Rule 9510 is not a standard for control of emissions in the

21  absence of dictates for new engines or vehicles.   Rule 9510 does not mandate vehicle or engine

22  emissions limits or require pollution-control devices or emissions control designs for new vehicles or

23  engines subject to section 7543(a).   Rule 9510's operational emissions targets address reduction from

24  current vehicle fleet emissions levels. The emissions reductions apply to the total associated area source

25  and mobile source emissions regarding a project's operation.  Rule 9510 emissions targets are not an

26  emission rate to limit an engine's emissions; the targets are cumulative emissions from a project emitted

27  over 10 years.  A developer's option to purchase or use cleaner vehicles does not render Rule 9510's

28  emissions targets as standards to control vehicle emissions.

1    Section 7543(b)(1) allows EPA to waive section 7543(a) for standards for emissions from new

2    motor vehicles or engines if the EPA makes specific findings.  NAHB notes that California has not

3    sought a section 7543(b)(1) waiver and that the EPA has not made required findings for a waiver.  Thus,

4    NAHB concludes that section 7543(a) preempts Rule 9510's reduction requirements for construction

5    equipment and operational emissions to entitle NAHB to summary judgment on its third cause of action.

6    Again, as noted above, in the absence of a standard, the issue of EPA waiver is immaterial.

7                                              **In Use Requirement**

8    The District characterizes Rule 9510 as "'in use' requirement" authorized by section 7543(d).

9    NAHB argues that "Rule 9510 cannot be salvaged by claiming that it is an allowable 'in use'

10   requirement."

11   Section 7543(d) provides that states are not denied "the right otherwise to control, regulate, or

12   restrict the use, operation, or movement of registered or licensed motor vehicles."  The "longstanding

13   scheme of motor vehicle emissions control has always permitted the states to adopt in-use regulations

14   – such as carpool lanes, restrictions on car use in downtown areas, and programs to control extended

15   idling of vehicles – that are expressly intended to control emissions." *Engine Manufacturers*, 88 F.3d

16   at 1094.  Section 7543(d) "makes clear that the preemption provision is not intended to preempt state

17   regulation other than as expressed" in section 7543(a). *Motor and Equipment Manufacturers*, 627 F.2d

18   at 1107, n. 19.

19   NAHB argues that Rule 9510's "overall emissions reduction limits" do not regulate the use,

20   operation or movement of nonroad construction equipment or on-road vehicles.  To support its argument

21   as to inapplicability of an in use requirement, NAHB points to *Pacific Merchant*, 517 F.3d at 1115,

22   which addressed emissions of ocean-going vessels:

23       The Marine Vessel Rules create a limit on emissions (i.e. emissions must not be greater
         than what would be emitted using the specified fuels) that is presumed to be met if the
24       specified fuels are used. . . . Supplying a presumed mode of compliance does not alter
         the nature of the general requirement limiting emissions.  Indeed, the Marine Vessel
25       Rules do not impose an in-use fuel requirement because no particular fuel is required to
         be used at all.

26

27   NAHB concludes that Rule 9510's required reductions for operational and construction equipment

28   emissions are standards, not in use requirements.

1   The District responds that Rule 9510 is "an in use regulation that indirectly controls emissions

2   of vehicles and equipment attracted to development projects" and "requires mitigation features and fees

3   to accomplish regulation of these mobile sources."  The District notes that the CAA does not "interfere

4   with local regulation of the use or movement of motor vehicles after they have reached the ultimate

5   purchaser."  "Enforcement of the Clean Air Act before [the] first sale [of new motor vehicles] is the sole

6   and exclusive prerogative of the federal government."  *Sims v. State of Fla., Dept. of Highway Safety*

7   *and Motor Vehicles,* 862 F.2d 1449, 1455 (11th Cir.), *cert. denied*, 493 U.S. 815, 110 S.Ct. 64 (1989).

8   The District argues that 7543(d) protects a state's "longstanding authority to adopt in use regulations

9   intended to control mobile source emissions" and that no comprehensive listing "limits the authority of

10  states and local government as to the types of measures that constitute in use regulations."

11  The NAHB fails to substantiate its advocated narrow scope of an in use requirement argument.

12  Acceptable in use requirements include setting fuel requirements, operational conditions or limits on

13  equipment use, fuel quality specifications, and operational modes or characteristics or measures that

14  limit engine or equipment use.  *Engine Manufacturers*, 88 F.3d 1094, n. 58 ("in-use restrictions are

15  inherently local in character").  Rule 9510 is not a standard to control emissions.  Section 7543(d)

16  authorizes Rule 9510, which is a regulation that touches on use and movement of post-sale vehicles and

17  is a proper exercise of the District's power to control emissions.

**Indirect Source Review**

19  NAHB argues that the CAA does not authorize states to adopt emissions standards or regulations

20  under the guise of "indirect source review."  The District defendants respond that Rule 9510 is consistent

21  with Congressional intent for control of indirect sources.  Environmental Defense and Sierra Club

22  explain that an indirect source review program seeks to "reduce pollution that comes from mobile

23  sources" by setting requirements for a development site and does not set limits on mobile sources such

24  as a motor vehicle standard.

25  Section 7410 addresses SIPs for ambient air quality standards and provides in pertinent part:

26  "Any state may include in a State implementation plan, but the [EPA] Administrator may not require

27  as a condition of approval of such plan under this section, any indirect source review program."  42

28  U.S.C. § 7410(a)(5)(A)(i).

1     Section 7410(a)(5)(C) defines an "indirect source" as:

2     . . . a facility, building, structure, installation, real property, road, or highway which
**attracts, or may attract, mobile sources of pollution**.  Such term includes parking lots,
3     parking garages, and other facilities subject to any measure for management of parking
supply (within the meaning of subsection (c)(2)(D)(ii) of this section), including
4     regulation of exiting off-street parking but such term does not include new or existing on-
street parking.  Direct emission sources or facilities at, within, or associated with, any
5     indirect source shall not be deemed indirect sources for purposes of this paragraph.
(Bold added.)

6

7     Section 7410(a)(5)(D) defines an "indirect source review program" as:

8     . . . the facility-by-facility review of indirect sources of air pollution, including such
**measures as are necessary to assure, or assist in assuring, that a new or modified**
9     **indirect source will not attract mobile sources of air pollution**, the emissions from
which would cause or contribute to air pollution concentrations –

10

11          (i) exceeding any national primary ambient air quality standard for a mobile
source-related air pollutant after the primary standard attainment date, or

12          (ii) preventing maintenance of any such standard after such date.  (Bold added.)

13          NAHB argues that the CAA's allowing states to regulate indirect sources of emissions does not

14   permit the District to regulate air emissions of mobile source construction equipment "at, within or

15   associated with" a construction site which is a indirect source under section 7410(a)(5).  NAHB points

16   to Rule 9510's definition of "indirect source" as "any facility, building, structure, or installation, or

17   combination thereof, which attracts or generates mobile source activity that results in emissions of any

18   pollutant, or precursor thereof, for which there is a state ambient standard, as specified in Section 1.1

19   [of Rule 9510]."  NAHB argues that by such definition, the "District seeks to regulate nonroad

20   construction equipment that happens to be working at a construction site, requiring such construction

21   equipment between 50 and 175 horsepower to achieve quantifiable emissions reductions of PM10 and

22   NOx."  NAHB continues that although a construction site "generates mobile source activity" to result

23   in PM10 and NOx emissions, the District cannot prescribe emissions limits for mobile sources.  NAHB

24   concludes that Rule 9510 "exceeds the District's indirect source review authority because the Rule is

25   not limited to the regulation of indirect sources to reduce how many mobile sources they attract, but

26   rather Rule 9510 regulates direct sources of emissions."

27          The District responds that NAHB applies Rule 9510 too narrowly to indirect source regulation.

28   The District argues that section 7410(a)(5)(A) "curtails EPA's authority over indirect sources, but

1   maintains the states' authority to enact such programs they deem appropriate."   Section

2   7410(a)(5)(A)(i)'s effect "is to treat indirect sources as a separate category of sources subject to a

3   different legal regime. The states may still 'choose[ ]' to regulate them in state implementation plans,

4   42 U.S.C. § 7410(a)(5)(A)(i), but the decision whether and how to regulate is left largely to the states."

5   *Sierra Club v. Larson*, 2 F.3d 462, 467 (1st Cir. 1993).   As such, the District contends that Congress

6   intended that "state and local agencies have broad power to regulate mobile source emissions through

7   use of indirect controls" to render Rule 9510 an "intended" indirect approach to mobile source

8   regulation.   The District notes that Rule 9510 requires mitigation of vehicle traffic and non-road

9   construction equipment attracted to development sites to render such sources neither "some permanent

10  feature" nor a "direct emissions source." The District concludes that Rule 9510 regulates development

11  sites which "attract mobile source activity" through "design features, limits on the use of construction

12  equipment, and payment of regulatory fees."

13         As to NAHB's "indirect source" definition argument, Environmental Defense and Sierra Club

14  correctly note NAHB's reliance on a definition not used to define Rule 9510's applicability. Section 2.0

15  of Rule 9510 provides that Rule 9510 applies to specified "development" and "transportation and

16  transit" projects.   The 2.0 applicability section does not use the term "indirect source" and is not

17  connected to the definition cited by NAHB.  Moreover, Rule 9510 satisfies section 7410(a)(5)(D) as an

18  indirect source program in that Rule 9510 uses emissions fees as an incentive to developers on a project-

19  by-project basis to reduce mobile source emissions.  Rule 9510 sets emissions reduction targets for

20  mobile source emissions associated with project construction and operation.  If a developer is unable to

21  reduce mobile source emissions to meet targets, the developer pays a mitigation fee which the District

22  uses to fund off-site pollution control projects to offset mobile source emissions caused by the project.

23  Rule 9510 does not adopt emissions standards or regulations under the guise of "indirect source review."

24                              **CONCLUSION AND ORDER**

25         For the reasons discussed above, this Court:

26  1.      DECLARES that Rule 9510 is not preempted by section 7453 and is an appropriate in

27          use regulation and indirect source review program;

28  2.      GRANTS summary judgment in favor of defendants the San Joaquin Valley Unified Air

Pollution Control District and the Governing Board of the San Joaquin Valley Unified Air Pollution Control District, in favor of intervenor-defendants Environmental Defense and Sierra Club and against plaintiff National Association of Home Builders;

3. DIRECTS the clerk to enter judgment in favor of defendants the San Joaquin Valley Unified Air Pollution Control District and the Governing Board of the San Joaquin Valley Unified Air Pollution Control District, in favor of intervenor-defendants Environmental Defense and Sierra Club and against plaintiff National Association of Home Builders; and

4. FURTHER DIRECTS the clerk to close this action.

IT IS SO ORDERED.

**Dated:    September 18, 2008**                    **/s/ Lawrence J. O'Neill**
                                                     UNITED STATES DISTRICT JUDGE

26